STATE OF MAINE

KENNEBEC, ss.

RECEIVED AND FILED
KENNEBEC SUPERIOR COURT

2005 JAN -9 A 11: 53

MARY DESJARDIN
CLERK OF COURTS

SUPERIOR COURT
CRIMINAL ACTION
DOCKET NO. CR-04-731
SKS-KEN-1/2/06

STATE OF MAINE,

v.

DAVID GRANT,

Defendant

**DECISION ON MOTION
TO SUPPRESS**

This matter comes before the court on the defendant's motion to suppress the introduction into evidence of statements he made during the period from his initial contact with law enforcement officials on November 30, 2004, until his formal arrest on December 2, 2004. The defendant argues that these statements must be suppressed as being involuntarily made in light of his physical and mental condition at the time, and also that these statements were made in violation of defendant's rights protected under the Fourth, Fifth and Sixth Amendments of the United States Constitution and Art. 1, §§ 5 and 6 of the Constitution of the State of Maine. After reviewing the totality of the evidentiary circumstances and the applicable law, the court will deny the motion.

**Facts**

Solely for purposes of this motion, the court makes the following findings of fact: At approximately 11:30 p.m. on the evening of November 30, 2004, law enforcement and emergency personnel were summonsed to the site of a single vehicle accident in Palmyra, Maine. The defendant's pickup truck had in some way left the surface of the road and was in a ditch at the side of Route 2. The truck had blood on the exterior of the driver's side door and a large amount of blood, which appeared to be fresh, in the bed of the truck. When the rescue personnel arrived, defendant was seated in the cab of the truck holding a knife, which he alternately waved around and stuck in his neck.

One of the officers broke a side window and used aTaser on the defendant to subdue him by electric shock. The officers struggled with the defendant to remove the knife from his grasp and then remove the defendant from the vehicle, repeatedly shocking him during the struggle. The defendant was found to be clutching a small plastic bag containing cocaine, which was seized as evidence.

Once out of the truck, the defendant was handcuffed and strapped to a long board. With the defendant subdued and stabilized, Emergency Medical Technicians began medical treatment. The defendant told the technicians that he had "done" about a half an ounce of cocaine. The defendant then was moved by ambulance to the Eastern Maine Medical Center (EMMC) in Bangor. One of the EMT's accompanying the defendant is also a part-time police officer for the Newport Police Department, though he was not in uniform. The defendant's wrists remained cuffed during the transportation and at EMMC for the defendant's own protection. This was standard operating procedure.

On the way to the hospital, the emergency crew tried to compile a medical history of the defendant's activities and drugs which he had ingested. The part-time Newport officer, who had noticed the blood in the back of the truck, asked the defendant whether anyone else had been involved in the motor vehicle accident, to which the defendant answered, "I don't know." Neither the regular emergency crew nor the part-time Newport officer was aware during the delivery of the defendant to the hospital that the defendant had become the subject of a law enforcement investigation elsewhere.

At approximately 11:40 a.m. on December 1, 2004, the first team of Maine State Police detectives went to EMMC to attempt to collect the defendant's clothing and speak with him. By this time, the detectives had received communications with regard

to Janet Hagerthy, the defendant's mother-in-law. It is unclear from the evidence presented at hearing whether Ms. Hagerthy's body had been found at that point in the investigation. However, an earlier phone call from the defendant to his wife saying that he was heading up the interstate to visit a new friend in Bangor and the events at and after the accident scene on Route 2, left the detectives suspicious.

At approximately 4:26 a.m., just after the defendant was wheeled out of surgery and placed in intensive care, the detectives attempted to interview the defendant for the first time. The defendant was awake but sedated. Defendant was given a *Miranda* warning of his constitutional rights to remain silent and to be represented by counsel, but the defendant started talking about sailing on his boat. When it appeared to the detectives that the defendant was not in the right state of mind to give a statement, they terminated the attempted interview. One of the detectives asked whether the defendant would like to talk with them later on, to which the defendant made a mumbling sound. Approximately five hours later that same morning at 9:51 a.m., a third Maine State Police detective again attempted an interview. The detective again advised the defendant of his constitutional rights, but the defendant said that he did not want to talk; that his throat was sore. The defendant also asked the detective how the detective had gotten on the defendant's boat. When asked if he would answer questions, the defendant answered no and then again mentioned his sore throat.

At 11:45 a.m., the detective again returned to the defendant's room and advised him of his constitutional rights to remain silent and to have counsel present. The defendant again stated that his throat was sore. The detective asked him if he could write, to which the defendant replied that his hands were also sore. The detective's questions included the following: "Throat really sore?"; "Is that why you don't want to talk with me?"; "In a little while?"; (to which the defendant responded, "Don't think

so."); and finally, "Do you want me to come back in a little while?" "Okay." (to which there was no response).

At 1:42 p.m., the detective made yet another attempt to interview the defendant, who stated that he did not want to answer questions at that time. Throughout December 1st, there was a law enforcement officer posted outside of the defendant's hospital room, though there is no indication that the defendant would have had any knowledge of this law enforcement presence.

The State Police detective returned to the hospital at approximately 8:00 a.m. on December 2. The detective learned from the nurses that the defendant had been speaking with them and that he had not been given any pain medications since the preceding afternoon. The detective asked the defendant if he wished to talk after he was cleaned up. At 9:03 a.m., the detective again advised the defendant of his constitutional rights by reading from the so-called "Miranda card." The defendant acknowledged understanding each of the statements. Shortly into the questioning, the following dialogue took place (DT = detective; DG = defendant):

DT - And do you know why I'm here to talk with you?

DG - Yes.

DT - Why am I here to talk with you?

DG - About JANET HAGERTHY.

DT - Okay. And why do you think I want to talk about JANET HAGERTHY?

DG - I don't know if I should tell you without a lawyer. I just don't know, David, you know?

DT - Uh – huh. Well, you know, that's totally up to you.

DG - See, I don't know . . . you know?

DT - And, you know, that's why I read you the Miranda rights Um . . . it . . . it's totally up to you. I'm not going to . . . to tell you that you have to talk to me, obviously, because you don't have to. I will tell you the last paragraph in that says that . . . that you can talk to me and if you decide to stop talking to me at any point, that you can say I don't want to talk any more. Um . . . you know, so that's . . . that's totally up to you and I want to very clear on that, DAVID. I'm not here twisting your arm or anything. You know there are certain things that we obviously . . . we obviously know . . .

DG - Yeah, I know that.

DT - You know that this is what we do for a living.

DG - Yeah, I know that . . . DAVID . . . I just . . . but then if I get a lawyer and he just reams me a new butt because I said stuff. You know what I'm saying and I (inaudible) . . .

DT - Uh, huh.

DG - (Inaudible).

Following this exchange, the defendant and the detective are interrupted by a doctor, following which the detective made a statement that he believed that the defendant understood his constitutional rights and noted that he appeared to be different at that time than he did the day before.

Following the exchange set forth above, the interview proceeded until 9:47 a.m. when the following took place:

DG - I'd really like to have a lawyer present, I think.

DT - Okay.

DG - I really would, DAVE.

DT - Okay. All right. So you'd like to stop the interview then?

DG - Please.

DT - Okay. Yep, that . . . that's fine.

DG - I mean I know I've already told you enough to hang me . . . but I think I'd really like to have a lawyer present.

DT - That's fine. I'm just going to note the time that I'm gonna stop the tape recorder at uh 0947 hours.

DG - I don't think I can afford one, either.

DT - Okay, yep.

The defendant was released from the hospital and formally arrested for the murder of Janet Hagerthy later that day.

## Discussion

The defendant argues in favor of suppressing statements which he made during the period from his initial contact with first responders at the accident scene on November 30 through his arrest on the afternoon of December 2 by arguing first, that his statements were not voluntarily due to his physical and mental condition and, second, that his indication to the detectives that he did not wish to answer questions on December 1 should taint the subsequent questioning on December 2. These issues will be discussed separately following an examination of the concept of "custody" as it may affect these legal concepts.

1.    **Custody.**

Both sides, but particularly the State, spent considerable time on the question of whether the defendant was in "custody" at various points during the period in question. Ordinarily, the concept of "custody" in this context is associated with the process set forth by the United States Supreme Court in its landmark decision in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1996). Building on its decisions in *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964) and *Escobedo v. Illinois*, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), the *Miranda* court again addressed concern about the possibility of law enforcement investigators

taking advantage of suspects who are not aware of their Fifth and Sixth Amendment rights to silence and counsel. In *Escobedo*, the Court stated:

> We have also learned the companion lesson of history that no system of criminal justice can, or should, survive if it comes to depend for its continued effectiveness on the citizen's abdication through unawareness of their constitutional rights. No system worth preserving should have to fear that if an accused is permitted to consult with a lawyer, he will become aware of, and exercise, these rights. If the exercise of constitutional rights will thwart the effectiveness of a system of law enforcement, then there is something very wrong with that system.

The *Escobedo* Court also spoke of a defendant's Fifth Amendment rights as being "his absolute constitutional right to remain silent." What the *Miranda* court did was to extend the ruling in *Escobedo* thus:

> We start here, as we did in *Escobedo*, with the premise that our holding is not an innovation in our jurisprudence, but is an application of principles long recognized and applied in other settings. We have undertaken a thorough reexamination of the *Escobedo* decision and the principles it announced, and we reaffirm it. That case was but an explication of basic rights that are enshrined in our Constitution – that 'No person . . . shall be compelled in any criminal case to be a witness against himself,' and that 'the accused shall . . . have the Assistance of Counsel' – rights which were put in jeopardy in that case through official overbearing. These precious rights were fixed in our Constitution only after centuries of persecution and struggle. And in the words of Chief Justice Marshall, they were secured "for ages to come, and . . . designed to approach immortality as nearly as human institutions can approach it," *Cohen v. Virginia*, 6 Wheat. 264, 387 (1821).

The Court then proceeded to explain the procedures which it felt were minimally required in order to protect the unknowing from having their constitutional rights violated by over zealous law enforcement. The holding, in summary, was that when law enforcement officials representing the State place an individual in circumstances which equate to being in custody and anticipate a custodial interrogation, they must advise the suspect of his or her rights to remain silent and right to counsel before beginning the questioning, otherwise the answers to the questions would be deemed inadmissible. *Miranda* did not create any new rights; the rights were already set forth in

the amendments to the Constitution and recognized in case law. Nor did the *Miranda* decision have anything to do with triggering or securing the applicability of those rights; they exist and are applicable at any time there is an interaction between law enforcement agents of the State and private citizens. All the *Miranda* decision did – if "all" is appropriate in light of the pages of decisions it spawned – was to identify a point in time as part of an investigative process at which law enforcement investigators must advise individuals subject to interrogation of their Fifth and Sixth Amendment constitutional rights, i.e., when there are subject to "custodial interrogation."

The foregoing review of *Miranda* is important only in light of the State's argument that constitutional protections, particularly the protection of the Fifth Amendment, "…arise only when a defendant is subject to 'custodial interrogation'." and "… Fifth Amendment protections do not attach until the advent of custodial interrogation". (State's brief, p. 7) This interpretation of law is simply incorrect. These protections are always present and can always be claimed by individuals approached by law enforcement personnel regardless of whether the individuals are in "custody" or not. It is only the State's duty to educate the individual about his rights, which is triggered by custodial circumstances, not the rights themselves. However, State need not worry in the present case since the detectives were scrupulous and commendable in their faithful delivery of the *Miranda* instructions concerning the defendant's constitutional rights.

The court finds that while the defendant was in care and custody from the late night of November 30 to the afternoon of December 2, that custody was custody only in a medical sense. The purpose of the defendant's confinement was medical attention, not law enforcement investigation. Given the same injuries and medical condition of the defendant at the time of admission, no reasonable person would have thought

himself "in custody" for *Miranda* purposes while being treated at the hospital, at least until the point when the detectives exercised the search warrant to obtain physical specimens from him. The court finds that the defendant came into custody at the time of the execution of the search warrant, but was not in custody, for whatever it is worth, prior to that point.

## 2.    Defendant's refusal to answer questions.

The next issue raised concerns the several times during December 1st when the defendant declined to answer questions and the effect of these refusals on the more extended interview on the morning of December 2nd. At least four times on December 1st, and at least one of those times occurring after the defendant would be considered to be "in custody," a State Police detective approached him and attempted to ask questions. No questioning took place, given the defendant's condition and sometimes irrational or delusional statements. The detective was simply trying to obtain a statement as soon as the defendant was in a condition to give one, and met a series of refusals. The defendant argues that this series of aborted questionings constituted a clear assertion of his constitutional right to remain silent which would cut off any further questioning, including most specifically his later statements on December 2. However, in order to have this effect, the defendant's assertion of his right to cut off questioning must be a clear and unambiguous articulation of that desire. *State v. King*, 1998 ME 60, ¶ 9. At each one of the attempted interrogations on December 1st, the defendant declined to speak because his throat was understandably sore or his hands were sore and it would be difficult to write. In each case, the defendant also left open the possibility that he would be willing to answer questions at a later time when it was easier for him to do so. At no time did the defendant clearly and unambiguously assert his Fifth Amendment right to remain silent, and nothing that happened on December 1

would cause the suppression of the statements made during interrogation on December 2.

### 3. Waiver.

At the beginning of the custodial interrogation on the morning of December 2, 2004, the detective again advised the defendant of his rights pursuant to the educational requirements of *Miranda*. It is clear to the court from the testimony and transcript of the interrogation that the defendant was fully aware of his rights to remain silent and, particularly, his right to counsel. However, despite knowledge of these rights, it is constitutionally permissible for the subject of the interrogation to waive those rights and proceed to answer, which answers will be admissible at trial. It is the State's burden to prove beyond a reasonable doubt that such waiver was voluntary given in order to defeat a suppression motion. There is no question in the present case that the informational statement required by *Miranda* was properly administered and that the defendant understood those rights. Specifically, at more than one point in the colloquy, the defendant makes reference to his right to counsel and the displeasure that counsel might have concerning his statements to the police. The court finds that the defendant knowingly waived his Fifth and Sixth Amendment constitutional rights during the interrogation of December 2, up to that point when he specifically asserted that right and the detective concluded the interrogation.

### 4. Voluntariness.

In addition to proving that a defendant has knowingly waived his constitutional rights, the State must also prove that the statements were voluntarily and not the product of coercive police conduct. This proof of voluntariness is on the State and must be proved beyond a reasonable doubt. *State v. Collins*, 297 A.2d 620, 626 (Me. 1972). The court finds that there is no evidence whatsoever of compulsion by the detective

with regard to the defendant's statement of December 2nd. The questioning took place in the neutral environment of a hospital room, there was apparently one law enforcement officer there, there was no indication that the officer was armed or made any threatening gesture towards the defendant. Listening to the tape of the interrogation furthers the conclusion that the defendant was alert and rationale – unlike his situation or condition the day before – at the time of the questioning on the 2nd. The one event which characterizes the defendant's knowledge and voluntary decisions perhaps better than any other is his decision to assert his right to counsel and terminate the interrogation.

In summary, although the court has some disagreement concerning arguments about the attachment of constitutional protections, it finds the defendant's ultimate statements to have been knowing and voluntary following a knowing waiver of his constitutional rights. Therefore, the entry will be:

Motion DENIED.

Dated: January 3 , 2006

S. Kirk Studstrup
Justice, Superior Court

STATE OF MAINE
  vs
DAVID NEWELL GRANT
416 CROSS HILL ROAD
AUGUSTA ME 04330

DOB: 02/02/1950
Attorney: CHRISTOPHER MACLEAN
         ELLIOTT & MACLEAN, LLC
         20 MECHANIC STREET
         PO BOX 1
         CAMDEN ME 04843-0001
         APPOINTED 11/04/2005

Filing Document: INDICTMENT
Filing Date: 12/30/2004

SUPERIOR COURT
KENNEBEC, ss.
Docket No  AUGSC-CR-2004-00731

**DOCKET RECORD**

State's Attorney: ANDREW BENSON

Major Case Type: HOMICIDE

## Charge(s)

**1   MURDER**                                **11/30/2004 FARMINGDALE**
**Seq 621   17-A  201(1)(A)**          **Class M**

## Docket Events:

12/30/2004 FILING DOCUMENT -  INDICTMENT FILED ON 12/30/2004

           TRANSFER -  BAIL AND PLEADING GRANTED ON 12/30/2004

           TRANSFER -  BAIL AND PLEADING REQUESTED ON 12/30/2004

01/03/2005 Charge(s): 1
           HEARING -  ARRAIGNMENT SCHEDULED FOR 01/05/2005 @ 8:30

01/04/2005 Party(s): DAVID NEWELL GRANT
           ATTORNEY -  APPOINTED ORDERED ON 12/30/2004

           Attorney: THOMAS GOODWIN
01/05/2005 Charge(s): 1
           HEARING -  ARRAIGNMENT HELD ON 01/05/2005
           S KIRK STUDSTRUP , JUSTICE
           Attorney: THOMAS GOODWIN
           DA: ANDREW BENSON          Reporter: JANETTE COOK
           Defendant Present in Court

           READING WAIVED.  DEFENDANT INFORMED OF CHARGES.  COPY OF INDICTMENT/INFORMATION GIVEN TO
           DEFENDANT.  21 DAYS TO FILE MOTIONS
01/05/2005 Charge(s): 1
           PLEA -  NOT GUILTY ENTERED BY DEFENDANT ON 01/05/2005

01/05/2005 Charge(s): 1
           PLEA -  NOT GUILTY ACCEPTED BY COURT ON 01/05/2005

01/05/2005 BAIL BOND -  NO BAIL ALLOWED SET BY COURT ON 01/05/2005

01/05/2005 MOTION -  MOTION FOR MENTAL EXAMINATION MADE ORALLY BY DEF ON 01/05/2005


01/07/2005 MOTION -  MOTION FOR MENTAL EXAMINATION GRANTED ON 01/06/2005


           COPY SENT TO STATE FORENSIC SERVICE
02/10/2005 PSYCHIATRIC EXAM -  STAGE ONE REPORT FILED ON 02/10/2005


02/24/2005 PSYCHIATRIC EXAM -  STAGE TWO EXAM ORDERED ON 02/24/2005
           S KIRK STUDSTRUP , JUSTICE
           COPY FAXED TO LAURIE DAY AT FORENSIC                        APPOINTMENT
           SCHEDULED FOR 3/10/05 AT 9:00 WITH DR. BAEDER AND 3/29/05 AT   12:00 NOON WITH DR. SCHETKY
04/11/2005 PSYCHIATRIC EXAM -  STAGE TWO REPORT FILED ON 04/11/2005


           PSYCHOLOGICAL PORTION FILED.
04/22/2005 PSYCHIATRIC EXAM -  STAGE TWO REPORT FILED ON 04/22/2005


           PSYCHIATRIC PORTION
05/17/2005 MOTION -  MOTION FOR FUNDS FILED BY DEFENDANT ON 05/17/2005


05/18/2005 MOTION -  MOTION FOR FUNDS GRANTED ON 05/17/2005
           S KIRK STUDSTRUP , JUSTICE
           COPY TO PARTIES/COUNSEL
06/02/2005 HEARING -  CONFERENCE HELD ON 05/16/2005
           JOSEPH M JABAR , JUSTICE
           DEFENSE WILL NEED 60 -90 DAYS AFTER THE EXAM TO BE READY FOR TRIAL.  COUNSEL INQUIRED
           ABOUT BAIL.  IN LIGHT OF THE T15 EXAM NO BAIL WILL BE ALLOWED.  COUNSEL ESTIMATE A 4 TO 5
           DAY TRIAL.   TRIAL TO BE SCHEDULED IN NOVEMBER.
08/10/2005 TRIAL -  JURY TRIAL SCHEDULED FOR 11/14/2005


           NOTICE TO PARTIES/COUNSEL
08/10/2005 TRIAL -  JURY TRIAL NOTICE SENT ON 08/11/2005


           JURY SELECTION IS SCHEDULED FOR NOVEMBER 10, 2005 AT 9:00 A.M.
10/07/2005 HEARING -  CONFERENCE SCHEDULED FOR 10/11/2005 @ 1:00


           NOTICE TO PARTIES/COUNSEL
10/12/2005 HEARING -  CONFERENCE HELD ON 10/11/2005


10/19/2005 HEARING -  OTHER HEARING SCHEDULED FOR 10/27/2005 @ 8:30


           NOTICE TO PARTIES/COUNSEL
10/27/2005 HEARING -  OTHER HEARING HELD ON 10/27/2005
           S KIRK STUDSTRUP , JUSTICE
           Attorney:  THOMAS GOODWIN
           DA:  ANDREW BENSON          Reporter: JANETTE COOK
           Defendant Present in Court
10/27/2005 TRIAL -  JURY TRIAL NOT HELD ON 10/27/2005


10/27/2005 TRIAL -  BENCH SCHEDULED FOR 11/14/2005


           NOTICE TO PARTIES/COUNSEL
10/27/2005 MOTION -  MOTION TO RECUSE MADE ORALLY BY DEF ON 10/27/2005

10/27/2005 MOTION - MOTION TO RECUSE GRANTED ON 10/27/2005
         S KIRK STUDSTRUP , JUSTICE
         COPY TO PARTIES/COUNSEL
10/27/2005 REQUEST - WAIVER OF JURY TRIAL FILED ON 10/27/2005


10/27/2005 REQUEST - WAIVER OF JURY TRIAL APPROVED ON 10/27/2005
         S KIRK STUDSTRUP , JUSTICE
11/03/2005 MOTION - OTHER MOTION FILED BY DEFENDANT ON 11/02/2005


         MOTION FOR WITHDRAWAL OF JURY WAIVER
11/03/2005 HEARING - MOTION FOR WITHDRAWAL OF CNSL SCHEDULED FOR 11/04/2005 @ 3:00


         NOTICE  TO PARTIES/COUNSEL
11/03/2005 HEARING - OTHER MOTION SCHEDULED FOR 11/04/2005 @ 3:00


         MOTION FOR WITHDRAWAL OF JURY WAIVER
11/04/2005 MOTION - MOTION TO CONTINUE FILED BY DEFENDANT ON 11/04/2005


11/04/2005 MOTION - MOTION TO SUPPRESS FILED BY DEFENDANT ON 11/04/2005


11/07/2005 MOTION - MOTION TO SUPPRESS DENIED ON 11/04/2005
         DONALD H MARDEN , JUSTICE
         COPY TO PARTIES/COUNSEL
11/07/2005 MOTION - MOTION TO CONTINUE DENIED ON 11/04/2005
         DONALD H MARDEN , JUSTICE
         COPY TO PARTIES/COUNSEL
11/07/2005 HEARING - OTHER MOTION HELD ON 11/04/2005
         DONALD H MARDEN , JUSTICE
         Attorney: CHRISTOPHER MACLEAN
         DA: ANDREW BENSON         Reporter: JANETTE COOK
         Defendant Present in Court


         MOTION FOR WITHDRAWAL OF JURY WAIVER
11/07/2005 MOTION - OTHER MOTION DENIED ON 11/04/2005
         DONALD H MARDEN , JUSTICE
         MOTION FOR WITHDRAWAL OF JURY WAIVER
11/07/2005 TRIAL - BENCH NOT HELD ON 11/04/2005


11/07/2005 Charge(s): 1
         TRIAL - JURY TRIAL SCHEDULED FOR 11/14/2005


         NOTICE TO PARTIES/COUNSEL
11/07/2005 HEARING - MOTION FOR WITHDRAWAL OF CNSL HELD ON 11/04/2005


11/07/2005 Party(s): DAVID NEWELL GRANT
         ATTORNEY - WITHDRAWN ORDERED ON 11/04/2005


         Attorney: THOMAS GOODWIN
11/07/2005 Party(s): DAVID NEWELL GRANT
         ATTORNEY - APPOINTED ORDERED ON 11/04/2005


         Attorney: CHRISTOPHER MACLEAN
11/09/2005 JURY FILING - PROPOSED VOIR DIRE FILED BY STATE ON 11/09/2005

11/09/2005 OTHER FILING -  WITNESS & EXHIBIT LIST FILED BY STATE ON 11/09/2005

11/09/2005 MOTION -  MOTION TO CHANGE VENUE FILED BY DEFENDANT ON 11/09/2005

      ISSUED JUDGE FOR ACTION
11/09/2005 MOTION -  MOTION TO CONTINUE FILED BY DEFENDANT ON 11/09/2005

11/09/2005 MOTION -  MOTION FOR FUNDS FILED BY DEFENDANT ON 11/09/2005

11/09/2005 MOTION -  MOTION TO SUPPRESS FILED BY DEFENDANT ON 11/09/2005

11/14/2005 Charge(s): 1
      TRIAL -  JURY TRIAL CONTINUED ON 11/10/2005

11/14/2005 OTHER FILING -  WITNESS LIST FILED BY STATE ON 11/14/2005

      AMENDED WITNESS LIST
11/14/2005 MOTION -  MOTION TO CONTINUE GRANTED ON 11/10/2005
      S KIRK STUDSTRUP , JUSTICE
      COPY TO PARTIES/COUNSEL
11/14/2005 HEARING -  MOTION TO SUPPRESS SCHEDULED FOR 11/30/2005 @ 9:00

      NOTICE  TO PARTIES/COUNSEL
11/14/2005 HEARING -  MOTION TO SUPPRESS NOTICE SENT ON 11/14/2005

11/14/2005 HEARING -  MOTION TO CHANGE VENUE SCHEDULED FOR 11/30/2005 @ 9:00

      NOTICE  TO PARTIES/COUNSEL
11/14/2005 HEARING -  MOTION TO CHANGE VENUE NOTICE SENT ON 11/14/2005

11/23/2005 OTHER FILING -  MEMORANDUM OF LAW FILED ON 11/23/2005

      FILED BY ANDREW BENSON, AAG  - IN OPPOSITION TO DEFENDANT'S MOTION TO       SUPPRESS.
12/01/2005 HEARING -  MOTION TO SUPPRESS HELD ON 11/30/2005
      S KIRK STUDSTRUP , JUSTICE
      Attorney:  CHRISTOPHER MACLEAN
      DA:  ANDREW BENSON          Reporter: TAMMY DROUIN
      Defendant Present in Court

      STATE WITNESSES: ROGER SEDGEWICK, JAY PELLETIER, DEAN JACKSON, SGT DAVID TRIPP
12/01/2005 HEARING -  MOTION TO CHANGE VENUE CONTINUED ON 11/30/2005

      JUSTICE STUDSTRUP DECIDED TO HOLD OFF ON THE HEARING UNTIL CLOSER TO TRIAL POSSIBLY AT
      JURY SELECTION TO SEE IF PUBLICITY HAS HAD ANY EFFECT ON CASE
12/01/2005 CASE STATUS -  DECISION UNDER ADVISEMENT ON 11/30/2005
      S KIRK STUDSTRUP , JUSTICE
12/14/2005 TRIAL -  JURY TRIAL SCHEDULED FOR 01/23/2006 @ 8:30

      NOTICE TO PARTIES/COUNSEL
12/14/2005 TRIAL -  JURY TRIAL NOTICE SENT ON 12/14/2005

12/19/2005 OTHER FILING -  COUNSEL VOUCHER FILED ON 11/29/2005

Printed on: 01/09/2006

12/19/2005 OTHER FILING -  COUNSEL VOUCHER APPROVED ON 12/16/2005
          S KIRK STUDSTRUP , JUSTICE
12/23/2005 MOTION -  MOTION TO CONTINUE FILED BY DEFENDANT ON 12/23/2005

01/09/2006 MOTION -  MOTION FOR FUNDS GRANTED ON 11/29/2005
          S KIRK STUDSTRUP , JUSTICE
          COPY TO PARTIES/COUNSEL
01/09/2006 MOTION -  MOTION TO SUPPRESS DENIED ON 01/09/2006
          S KIRK STUDSTRUP , JUSTICE
          COPY TO PARTIES/COUNSEL
01/09/2006 MOTION -  MOTION TO CONTINUE GRANTED ON 01/03/2006
          S KIRK STUDSTRUP , JUSTICE
          COPY TO PARTIES/COUNSEL
01/09/2006 TRIAL -  JURY TRIAL CONTINUED ON 01/06/2006

01/09/2006 OTHER FILING -  OTHER DOCUMENT FILED ON 01/09/2006

          DECISION ON MOTION TO SUPPRESS

A TRUE COPY
ATTEST: _____
                    Clerk